## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION AT COVINGTON

CIVIL ACTION No. 2:18-cv-66 (WOB-CJS)

DEVONA WATSON                                          PLAINTIFF

VS.              **MEMORANDUM OPINION AND ORDER**

WESTERN & SOUTHERN FINANCIAL                    DEFENDANT
GROUP FLEXIBLE BENEFITS PLAN

     Plaintiff brought this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, after Defendant denied Plaintiff's application for short-term disability benefits, despite the fact that treating physicians and medical records corroborate that Plaintiff is unable to perform the duties of her occupation because she suffers from Grade IV osteoarthritis in her knees, a condition that is compounded by her morbid obesity. Plaintiff seeks the benefits she was denied, plus pre-judgment interest and attorney fees.

     This matter is now before the Court on the parties' cross-motions for judgment on the administrative record. (Docs. 23, 24).[1] The Court dispenses with oral argument

---

[1] Also before the Court is Defendant's related motion (Doc. 29) to strike Plaintiff's supplemental authority; namely, this Court's recent decision in *Laake v. Benefits Committee, Western & Southern Fin. Grp. Co. Flexible Benefits Plan*, No. 1:17-cv-611, 2019 WL 823575 (S.D. Ohio Feb. 21, 2019). *Cf.* (Doc. 28). The Court will deny this motion at the outset.

because the materials in the record adequately present the facts and legal contentions. For the reasons that follow, the Court concludes that Defendant's decision to deny Plaintiff short-term disability benefits was arbitrary and capricious.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     General Background

Plaintiff Devona Watson worked as a Senior Case Analyst at Western & Southern Life Insurance Co. (Doc. 22, AR at 270).[2] Since at least 2013, Watson has suffered from severe osteoarthritis in both knees, which is exacerbated by the fact that she is morbidly obese. *Id.* at 248, 267–68. In August 2017, Watson applied for short-term disability ("STD") benefits. At the time, she had been an employee of the company for over 28 years. *Id.* at 244, 270. As an employee, Watson was covered by the Western & Southern Financial Group Flexible Benefits Plan (the "Plan" or "Western & Southern"). (AR at 70, 72, 86).[3]

### 1. The Plan Terms

Under the Plan, STD benefits "are equal to two-thirds" of the employee's weekly earnings. (AR at 150). An individual who has been covered for at least four

---

[2] The administrative record in this case is a conventional filing. (Doc. 22). To avoid confusion, the administrative record is cited herein as (AR at ___), and the pages referred to are the BATES numbers.

[3] The Plan is an "employee benefit plan" as defined in 29 U.S.C. § 1002(3). (AR at 70). It "is a self-insured plan, except that the life insurance benefits and disability benefits . . . shall be provided by a group life insurance policy." *Id.*

years and "becomes Temporarily Disabled" can receive up to 26 weeks of STD benefits. *See* (AR at 149–50). "Temporarily Disabled" or a "Short-term Disability" is defined in the Plan as "a disablement resulting from Sickness or Injury of such a nature that as a result" the employee "is unable to perform **the normal duties of [their] regular occupation for any employer**." *Id.* at 84 (emphasis added).

Although that definition includes more than what Watson's employer deems the "normal duties" of a Senior Case Analyst, Watson's job description does state that she "works in an office setting and remains continuously in a stationary position for long periods of time while working at a desk, on a computer or with other standard office equipment, or while in meetings." *Id.* at 279.[4] In addition, "[e]xtended hours [are] required during peak workloads or special projects." *Id.*

### 2. Watson's Treatment History & STD Benefits Application

### a. Dr. Kunath

On August 2, 2017, Watson weighed 411 pounds when she presented to her rheumatologist, Dr. Arthur Kunath. (AR at 271–72; *see id.* at 266–67). Dr. Kunath observed that Watson "just looks miserable." *Id.* at 272. In his assessment, Watson suffers from morbid obesity and Grade IV osteoarthritis of the knees, "with limited

---

[4] The job description further explains that a Senior Case Analyst at Western & Southern is a member of the "Insurance Operations" and is, *inter alia*, "[r]esponsible for making informed decisions and manually calculating fund values for interest-sensitive products"; "[c]onducts training with [the] Specialist and Processor to ensure accuracy"; and [c]ollaborates with multiple areas" within the company. (AR at 278).

capacity now to walk." *Id.* at 272. Based on his review of Watson's x-rays, Dr. Kunath noted that "she does in fact have significant Grade IV [osteoarthritis] of the medical compartments of her knees." *Id.* Dr. Kunath's instructions were for Watson to visit Dr. Teresa Koesler at Western & Southern to "see if there is any way we can get bariatric surgery approved." *Id.* "If that is not possible," Dr. Kunath concluded, "then **I'm going to have to put her on disability**." *Id.* (emphasis added).

In considering other alternatives, Dr. Kunath noted that a "regular wheelchair" was not an option "because of significant problems starting now in her right shoulder," so the "only other option" at the time was "maybe a motorized wheelchair." But even this seemed "problematic" due to Watson's weight. *Id.*

In summarizing the history of Watson's condition, Dr. Kunath noted:

[Watson] states that the problems continue to slowly worsen. She is having greater and greater difficulty getting to her desk at work and getting back out to the car at night. Someone picks her up and drops her off but she states it is getting more and more painful. Once she gets to her desk she is able to do her work **but if she has to do any more walking during the day it is very difficult.**

Now the problem is her weight is 411 pounds today. I told her the only answer to her problems would be a gastric sleeve surgery or bariatric surgery . . . and then get her weight down and then get her knees replaced but [Watson] states that Western [&] Southern will not pay for any type of bariatric surgery . . . The patient does look miserable. **Other than that, I think we're going to just have to put her on Disability.**

(AR at 273) (emphasis added).

Watson later received a letter from Western & Southern, dated August 15,

2017, requesting medical documentation to substantiate an unspecified number of absences from work. *Id.* at 264. To be considered for STD benefits, the letter advised Watson that by September 14, 2017, she was required to submit the application form attached to the letter and the following documentation: (1) a medical diagnosis; (2) a medical treatment plan; (3) her anticipated return-to-work date; and (4) copies of office records pertaining to the relevant period of disability. *Id.*

On August 16, 2017, the Benefits Department received a note from Dr. Kunath, stating: "**Patient no longer able to work. Will be on short term disability for [the] next 60 days for her severe osteoarthritis of [her] knees.**" *Id.* at 265 (emphasis added). Watson then submitted her short-term disability benefits application. *Id.* at 270.

On August 25, 2017, Dr. Kunath sent a healthcare provider certification via facsimile to Western & Southern. *Id.* at 267. Watson's "essential job functions" and "job description" were attached. *Id.* Dr. Kunath noted Watson's diagnosis as "severe O.A. [osteoarthritis] of [the] knees complicated by obesity which **prevents patient ambulating any distance**." (AR at 268). In response to the question whether the associate is "unable to perform any of his/her job functions due to the condition," Dr. Kunath marked the box for "Yes" and wrote: "**Unable to attend meeting/ get to her desk/ or sit for extended periods of time**." *Id.* In the section at the bottom of the form for "additional information," Dr. Kunath restated the diagnosis and reiterated that Watson is:

> Unable to ambulate to desk, unable to walk to meetings or get around in office. She needs both knees replaced but no surgery will do until loses [*sic*] significant weight. We are taking her off work for [a] minimum [of] 6 months to see if knees will decrease in symptoms with limited ambulation.

*Id.* As a result of her medical condition, Dr. Kunath noted that Watson would be "incapacitated" and estimated that this would be the case for a period of six months (August 7, 2017, to February 7, 2018). *Id.* During this time, Dr. Kunath stated: Watson was to work "0 hour(s) per day; 0 days per week." *Id.*

Dr. Kunath's prognosis of Watson was anything but promising. He noted that the probable duration of Watson's condition was "indefinite" and her anticipated return to work was "unknown at this time [*sic*] possibly 2/7/18." *Id.* at 267.

### b. Dr. Hummel

The Benefits Department requested that Watson be evaluated by an orthopedic surgeon. *See* (AR at 235). Watson did just that on September 13, 2017, when she visited Dr. Matthew T. Hummel's office. He noted that Watson "comes in today for evaluation from Dr. Kunath" and "for an opinion on her ability to do activities." *Id.* at 248. At the appointment, Watson weighed 420 pounds. *Id.* Dr. Hummel related in his notes that:

> [Watson is] in a wheelchair today, morbidly obese with a significant history of long-term lower extremity pain, particularly with both knees. She has undergone a series of treatments with Dr. Kunath, everything ranging from anti-inflammatories, pain medications and injections with minimal help. The pain itself has been going on for three to four years. She has also seen her primary care physician, Dr. Allnutt. The pain she describes in both knees . . . [is] an 8 or a 9/10 pain with activity. It even

hurts at a 4/10 at rest. It is a constant aching, grinding and stiffness and she has trouble ambulating.

(AR at 248). Dr. Hummel's physical examination of Watson was "difficult" and he related that it "is really difficult for the patient to ambulate due to her size" and "[s]he cannot really get up on the exam table." *Id.* Dr. Hummel further evaluated Watson's functional capacity and reported that:

> Range of motion of both knees is near full extension and flexion to about 90 but it is more of a mechanical block due to her thigh. She has crepitus that is audible. She has pain with range of motion. The rest of the exam is very difficult to do just due to size.

*Id.* at 249. Dr. Hummel reviewed Watson's x-rays and concluded that they "show[ed] severe tricompartmental osteoarthritis, bilateral knees, genu varum with bone-on-bone articulation, eburnation and spurring in all three compartments without evidence of bony lesion or fracture." *Id.* Dr. Hummel's diagnosis: "Severe bilateral knee osteoarthritis." *Id.*

Although Dr. Hummel concluded that Watson "is not a surgical candidate" because "she is just too much of a high risk patient," Dr. Hummel reported that Watson needed to "find a way to get healthy enough to undergo knee replacements simply due to the fact that that arthritis is probably significantly limiting." *Id.* at 249.

### 3. Initial Denial of STD Benefits

Jen Segrist, a registered nurse with the Benefits Department of Western & Southern, sent a denial letter to Watson on September 26, 2017. The letter stated that the department "has reviewed the medical information submitted on 09/25/2017"

(the previous day). (AR at 247). The letter recited verbatim the Plan language that defines a qualifying disability and then summarily stated:

> The medical documentation submitted fails to support your claim for short-term disability benefits under the Plan. Your request for **additional** [STD] has been denied. **No additional information is necessary for you to perfect your claim.**

*Id.* (emphasis added). The letter goes on to advise Watson on how to pursue an appeal:

> [Y]ou may file an appeal by following the instructions on the enclosed review procedure for rejected Benefits Claims. In your appeal, you should submit all information in support of your claim, as the decision of the appeals committee will be final.

*Id.* at 247.

### 4. Watson's STD Benefits Appeal

On October 9, 2017, Watson filed her STD benefits appeal with the Benefits Appeals Committee (the "Committee"). (AR at 237–42, 261–62). In support of her appeal, Watson wrote a letter and attached: a copy of her history of prescription medication refills, (AR at 261–62); Western & Southern's record of her absences that were covered by various forms of leave, *id.* at 239; and an article on osteoarthritis and disability benefits from a website entitled, *Can You Get SSDI Disability or SSI for Osteoarthritis? DisabilitySecrets. Id.* at 240–42. In the letter, Watson stated: "I can't get to the office to do my job duties." *Id.* at 237. Watson described the impact her condition has on her job as follows:

> Before the pain became so bad and I was trying to get to work[,] I couldn't go to lunch, couldn't walk to the mailroom to get rid of my work, couldn't stand at the printer to get my prints and I had a very difficult

time getting to the restroom.

*Id.*

On November 7, 2017, the Committee reviewed Watson's appeal. *Id.* at 236. The Committee did not solicit the opinion of another physician. Instead, the Committee itself reviewed Watson's appeal. *Id.* at 235–36. In less than one page, the Committee provided a bullet-point summary of Watson's circumstances. Of significance, the Committee noted:

- "[Watson]'s first day off of work was 8/14/2017."

- "Her diagnosis is severe osteoarthritis of both knees complicated by morbid obesity."

- "[Watson] has been off of work more than 8 times in 6 months."

- "[Watson]'s rheumatologist, Arthur Kunath, MD, sent in a note stating member is "no longer able to work. Will be on short term disability for next 60 days for her severe osteoarthritis."

- "Dr. Kunath . . . [noted] the duration of her condition is indefinite and her anticipated return to work is unknown at this time, possibly 2/7/18."

- "FMLA note states member is unable to attend meetings, get to her desk or sit for long periods of time."

- "The length of disability based on MD Guidelines" for an individual with a sedentary job is: (a) 2 days if the condition is obesity; and (b) 0–7 days if the condition is osteoarthritis.

*Id.* at 235. The Committee also referenced an excerpt of a statement taken from Dr. Kunath's notes regarding Watson's August 2, 2017 visit, and stated that "Dr. Kunath state [*sic*] the member is 'able to do her work but if she has to do any more walking during the day it is difficult.'" *Id.* at 235. Western & Southern relies heavily on this

statement on to support its position in this litigation.

The Committee stated its decision at the end of the appeal summary in one handwritten sentence: "Denied – medical records failed to document sickness or injury that would result in employee's inability to perform the normal duties of her regular occupation." *Id.* at 236.

The Committee then notified Watson of its decision in a letter, dated November 15, 2017, and signed by the Vice President of Compensation and Benefits. *Id.* at 234. The letter recites the Plan's definition of disability and summarily concludes: "Since medical records failed to document a sickness or injury that would result in your [in]ability to perform the normal duties of your regular occupation, we are unable to honor your request for additional short-term disability benefits." *Id.* The letter contains no further explanation.

Watson filed the instant lawsuit on April 24, 2018. (Doc. 1).

## ANALYSIS

## I. The "Arbitrary-and-Capricious" Standard Applies

Before turning to the merits, there is some contention as to the appropriate standard of review. A challenge to an ERISA plan's denial of benefits is "reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Bos.*, 419 F.3d 501, 505–06 (6th Cir. 2005) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101,

115 (1989)). If, and "only if the benefit plan contains 'a clear grant of discretion [to the administrator],'" *Shelby Cty. Health Care Corp. v. Southern Council of Indus. Workers Health & Welfare Trust Fund*, 203 F.3d 926, 933 (6th Cir. 2003) (quoting *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998) (*en banc*)), then the decision to deny benefits is reviewed under "the highly deferential arbitrary and capricious standard of review." *Evans v. UnumProvident Corp.*, 434 F.3d 866, 875 (6th Cir. 2006) (internal quotation marks and citation omitted).

In the present case, the Plan clearly grants the administrator (the Committee) discretionary authority. Watson agrees. (Doc. 23 at 10, 17). Indeed, the Plan explicitly states that "[t]he Benefits Committee shall have the discretionary authority to determine eligibility for benefits and to construe the terms of the Plan," and that benefits under the Plan "shall be paid only if the Benefits Committee, as Plan Administrator, decides in its discretion that the applicant is entitled to them." (AR at 171). Thus, the Court reviews the Committee's final decision to deny Watson Benefits under the arbitrary-and-capricious standard.

A separate analysis of the Benefits Department's initial decision to deny Watson's STD benefits application is not required. Contrary to Watson's position, "the ultimate issue in an ERISA denial of benefits case is not whether discrete acts [or intermediate decisions] by the plan administrator are arbitrary and capricious but whether ***its ultimate decision*** denying benefits was arbitrary and capricious." *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1066 (6th Cir. 2014)

(emphasis added) (quoting *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002)).[5]

Therefore, because the Committee made the "ultimate decision" to deny Watson STD benefits and the Plan grants the Committee "discretionary authority to determine eligibility for benefits and to construe the terms of the Plan," the decisive question is whether the Committee's final decision was arbitrary and capricious.

The arbitrary-and-capricious standard of review is "the least demanding form of judicial review of administrative action." *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 342 (6th Cir. 2011). Courts "will uphold a plan administrator's decision 'if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 501 (6th Cir. 2010) (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)). Thus, "[a] decision is not arbitrary or capricious if it is rational in light of the plan's provisions," or if "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome." *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003) (citations and internal quotation marks omitted).

---

[5] Even if the Benefits Department's initial decision to deny Watson benefits was reviewed separately, the arbitrary-and-capricious standard would apply because the Plan also grants the Benefits Department discretionary authority to determine eligibility for benefits. *See* (AR at 149 ("[I]f a Covered Employee becomes Temporarily Disabled, **as determined by the Benefits Department in its sole discretion**, [Watson's employer] will pay Temporary Disability Benefits . . .")).

"The court reviews only the evidence available to the administrator at the time it made the final decision." *Corey v. Sedgwick Claims Mgmt. Servs.*, 858 F.3d 1024, 1027 (6th Cir. 2017); *Moon v. UNUM Provident Corp.*, 405 F.3d 373, 378 (6th Cir. 2005) (a federal court's "review is confined to the administrative record as it existed on [the date], when [the administrator] issued its final decision"). That review is conducted "in light of the administrative record as a whole." *Moon*, 405 F.3d at 381.

## II.  Western & Southern's Decision Was Arbitrary and Capricious

In determining whether a plan administrator's decision was arbitrary and capricious, the Sixth Circuit has delineated several guideposts, including: "[1] the quality and quantity of the medical evidence; [2] the existence of any conflicts of interest; [3] whether the administrator considered any disability finding by the Social Security Administration; and [4] whether the administrator contracted with physicians to conduct a file review as opposed to a physical examination of the claimant." *Shaw v. AT&T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 547 (6th Cir. 2015) (internal quotation marks omitted) (quoting *Fura v. Fed. Express Corp. Long Term Disability Plan*, 534 F. App'x 340, 342 (6th Cir. 2013)).

In *Shaw*, the Sixth Circuit  held that the plan administrator's decision was arbitrary and capricious because the administrator: (1) "ignored favorable evidence" from treating physicians; (2) "selectively reviewed the evidence it did consider from the treating physicians"; (3) "failed to conduct its own physical evaluation"; and (4) relied on a physician consultant who had been routinely retained by defendant and

his conclusions had "been questioned in numerous federal cases." 795 F.3d at 547, 548–551.

In this case, Western & Southern' apparent conflict of interest does not call into question its decision.[6] But, in almost every respect, the same hallmarks of arbitrary and capricious decision-making identified in *Shaw* are present. In particular, Western & Southern failed to consider Watson's relevant job duties; failed to offer any reason(s) for rejecting the opinion of Watson's treating physician; ignored favorable (and conclusive) evidence from Watson's treating physician (Dr. Kunath);

---

[6] When a plan administrator "is both the payor of any . . . benefits and . . . vested with discretion to determine . . . eligibility for those benefits," this creates an "inherent conflict of interest." *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 311 (6th Cir. 2010). But the existence of a conflict does not change the standard of review. *See, e.g.*, *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008); *Curry v. Eaton Corp.*, 400 F. App'x 51, 58 (6th Cir. 2010) ("[T]he arbitrary-and-capricious standard still applies . . ."). Rather, the apparent conflict is simply "one factor among several in determining whether the plan administrator abused its discretion in denying benefits." *Cox v. Std. Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009) (citing *Glenn*, 554 U.S. at 115); *Lewis v. Cent. States, Southeast & Southwest Areas Pension Fund*, 484 F. App'x 7, 11 n.5 (6th Cir. 2012). However, for a conflict of interest to affect whether a decision is arbitrary, "Sixth Circuit caselaw requires a plaintiff not only to show the purported existence of a conflict of interest, **but also to provide 'significant evidence' that the conflict actually affected or motivated the decision at issue.**" *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007) (emphasis added) (quoting *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir.1998)); *Hunt v. Metro. Life Ins. Co.*, 587 F. App'x 860, 862 (6th Cir. 2014).

Here, as explained, the Plan contains language sufficient to grant discretion to Western & Southern. Further, Western & Southern both grants eligibility for benefits and pays benefits. (AR at 149). But Watson has provided no evidence that Western & Southern's conflict of interest actually motivated its denial of benefits. Thus, the mere existence of this conflict does not make Western & Southern's decision arbitrary and capricious. *See Cooper*, 486 F.3d at 165.

*Watson v. Western & Southern Fin. Grp. Flexible Benefits Plan*

selectively reviewed the evidence it did consider; failed to conduct an independent physical examination; and conducted its own file review without the aid of a consulting physician.

### 1. Failing to Discuss the Physical Requirements of Watson's Job and Explain the Reasons for Concluding that Watson Can Perform Her Job Duties.

The controlling question under the "arbitrary and capricious" standard of review, is whether a plan offered "a reasoned explanation, based on the evidence, for its judgment that a claimant was not 'disabled' within the plan's terms." *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 617 (6th Cir. 2006). Therefore, based on the language of the Plan, the relevant question is whether Western & Southern "made a deliberate, principled, and reasoned decision" that is "supported by substantial evidence," *id.* at 617–18, in concluding that Watson's condition would not preclude her from "perform[ing] the normal duties of [her] regular occupation *for any employer*." (AR at 84, 234) (emphasis added).

When an administrator fails to discuss (i) the claimant's job duties and (ii) the reasons for concluding that the claimant is not precluded from working, this strongly suggests that the decision is arbitrary and capricious. *See, e.g.*, *Elliott*, 473 F.3d at 619 (finding in favor of claimant because consulting physician "presented no reasons for his conclusion that [the claimant]'s condition would not preclude her from working" and "never discussed [the claimant]'s job duties, which implies that he did not conduct a reasoned evaluation of her condition to determine whether she could

perform those duties."); *Hunter v. Life Ins. Co.*, 437 F. App'x. 372, 376–77 (6th Cir. 2011) (concluding denial of benefits was arbitrary and capricious where administrator failed to "assess [the claimant]'s ability to perform [the employer-provided job requirements], or any other specific physical requirements of her prior occupation.").

Here, Western & Southern issued conclusory denial letters. There is no mention of Watson's job duties or a discussion of the reasons for concluding that she can fulfill the demands of her position. (AR at 234, 247). In fact, there is no analysis whatsoever. The letters simply recite Plan's definition of short-term disability and then parrot that language back in the form of a conclusion. *Id.* at 234; *see id.* at 247. Thus, the fact that the final denial letter "offers a conclusory assertion that [the] evidence is insufficient to support disability benefits," counsels in favor of finding that Western & Southern's decision is arbitrary and capricious. *Godmar v. Hewlett-Packard Co.*, 631 F. App'x 397, 403 (6th Cir. 2015).

Western & Southern, however, argues that Watson could perform her "sedentary" job and that "there is no evidence that any assistance [Watson] needed could not have been accommodated." (Doc. 24 at 9–10, 13; Doc. 26 at 6–8). There are two problems with this argument.

First, the "term 'sedentary work' appears nowhere in the plan's terms." *See Elliott*, 473 F.3d at 620.[7] Under the Plan, Watson is considered disabled if she is

_____

[7] "When interpreting ERISA plan provisions, general principles of contract law

"unable to perform *the normal duties* of [her] regular occupation *for any employer*." (AR at 84). Moreover, the final denial letter does not contain the term "sedentary"; nor is the term "sedentary" found in Watson's job description. Naturally, an individual with a sedentary job does not arrive at work and then sit at their desk until they return home. A "sedentary job," as classified by the Department of Labor, is one that involves "sitting" and "walking and standing are required occasionally." 20 C.F.R. § 404.1567(a). Watson's job description entailed occasional walking to, *inter alia*, attend meetings, (AR at 278–79), and as discussed below, Dr. Kunath specifically concluded that Watson was "unable to perform any of [her] job functions," including "walk[ing] to meetings." (AR at 268). Western & Southern was required to explain why it believed otherwise and it failed to do so. *Shaw*, 795 F.3d at 548–49.

Second, Western & Southern's argument is contrary to the Plan's language. The Plan does not define a disability as one which prevents a claimant from performing their job duties *with an accommodation*, and more importantly, the final denial letter does not explain that the denial was based on Western & Southern's willingness to accommodate Watson's condition by altering the duties of her position. Rather, Western & Southern's "denial letters simply quote[d] the plan language and then conclude[d] [Watson]'s evidence fails to suffice." *Corey v. Sedgwick Claims*

---

dictate that [courts] interpret the provisions according to their plain meaning in an ordinary and popular sense." *Farhner*, 645 F.3d at 343 (quoting *Williams v. Int'l Paper Co.*, 227 F.3d 706, 711 (6th Cir. 2000)).

*Mgmt. Servs.*, 858 F.3d 1024, 1028 (6th Cir. 2017). This was arbitrary and capricious because it is well-established that an administrator "can't issue a conclusory denial and then rely on an attorney to craft a post-hoc explanation." *Id.* (citing *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 848 n.7 (6th Cir. 2007)).

Further, as detailed below, Western & Southern's failure to discuss the physical demands of Watson's position is amplified by the fact that it failed to give reasons for rejecting Dr. Kunath's conclusion that Watson could not perform a specific list of activities that fit within her regular job duties.

### 2. Failing to Explain the Reason for Rejecting the Conclusions of a Treating Physician

As a general rule, "plan administrators are not obliged to accord special deference to the opinions of treating physicians," and there is no "discrete burden of explanation when [administrators] credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 834 (2003). Nevertheless, an administrator "may not reject summarily the opinions of a treating physician, but must instead give reasons for adopting an alternative opinion." *See, e.g.*, *Shaw*, 795 F.3d at 548–49 (quoting *Elliott*, 473 F.3d at 620); *Nord*, 538 U.S. at 834. Moreover, "those reasons must be consistent with the terms of the plan and supported by the record." *Hayden v. Martin Marietta Materials, Inc. Flexible Benefits Program*, 763 F.3d 598, 608–09 (6th Cir. 2014) (finding for the claimant in part because the plan failed to "'give reasons' for rejecting a treating

physician's conclusions" (citation omitted)).

Dr. Kunath was aware of Watson's "job description" and "essential job functions" and he specifically opined that: (1) the osteoarthritis in her knees, further complicated by obesity, "prevents patient ambulating *any distance*"; (2) she is "unable to perform *any of [her] job functions* due to the condition" and in particular, "[u]nable to . . . sit for extended periods of time . . . Unable to ambulate to desk, [and] *unable to walk to meetings or get around in office*"; and (3) due to her condition, she would be "incapacitated" and could work "0 hour(s) per day; 0 days per week" for a period of at least six months, "possibly" ending February 7, 2018. (AR at 267–68); *see also Zuke v. Am. Airlines, Inc.*, 644 F. App'x 649, 654 (6th Cir. 2016) ("[A] treating physician's notes detailing the functional capabilities of a patient are objective evidence."). These physical limitations fall well within the demands of Watson's job. Yet Western & Southern's denial letters are bereft of any explanation as to why Dr. Kunath's conclusions were rejected.[8]

In fact, when the Committee reviewed Watson's appeal, it acknowledged that Dr. Kunath had concluded that Watson's "condition is indefinite and her return to

---

[8] Dr. Hummel's report substantiates Watson's osteoarthritis and obesity diagnosis and documents her difficulty ambulating. Although Western & Southern did not state why Dr. Hummel's report was irrelevant, his report does not address Watson's ability to perform her job functions and does not contain evidence that is any more favorable to Watson than what is in Dr. Kunath's report. *See* (AR at 248–49). At any rate, Dr. Hummel's report certainly does not contradict Dr. Kunath's conclusions; nor does it state that Watson could perform her job duties.

work is unknown at this time," and that Watson was "unable to attend meetings, get to her desk or sit for long periods of time." (AR at 235). But Western & Southern did not give any reason for rejecting these conclusions. This is a textbook indicator that Western & Southern acted arbitrarily and capriciously. *See, e.g.*, *Shaw*, 795 F.3d at 548–49; *Evans*, 434 F.3d at 877 ("[A] plan administrator may not arbitrarily disregard reliable medical evidence proffered by a claimant including the opinions of a treating physician."); *Elliott*, 473 F.3d at 620; *Kalish*, 419 F.3d at 510 (collecting cases); *see also Godmar*, 631 F. App'x at 404; *Calhoun v. Life Ins. Co. of N. Am.*, 665 F. App'x 485, 493 (6th Cir. 2016) (reviewing physician never "explained why he believed that the medical evidence did not support [the claimant]'s claim," and instead, "baldly asserted that 'the observed activities of daily living are inconsistent with the claimant's self-reported limitations'").

### 3. Selectively Reviewing Treating Physician Evidence and Ignoring Favorable Evidence

"An administrator acts arbitrarily and capriciously when it 'engages in a selective review of the administrative record to justify a decision to terminate coverage.'" *Shaw*, 795 F.3d at 548 (quoting *Metro. Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007)). Such a finding is even more pronounced where, as in this case, the administrator ignores favorable evidence from treating physicians that contradicts the administrator's decision. *Butler v. United Healthcare of Tenn., Inc.*, 764 F.3d 563, 568 (6th Cir. 2014) (finding that the plan acted arbitrarily and

capriciously in part because it "ignored key pieces of evidence" and made "factually incorrect assertions"); *Conger*, 474 F.3d at 265 (stating that a plan administrator ignoring, "without explanation[,] a wealth of evidence that directly contradicted its basis for denying coverage . . . [was] not deliberate or principled").

Here, Western & Southern insists that Watson is not disabled because Dr. Kunath stated in his notes for Watson's exam on August 2, 2017, that "[o]nce she gets to her desk she is able to do her work . . ." *See* (Doc. 24 at 4–5, 9, 11, 13; Doc. 26 at 5, 8, 10). But the Committee never offered this explanation, and therefore Western & Southern cannot now "rely on an attorney to craft a post-hoc explanation." *Corey*, 858 F.3d at 1028 (citing *Univ. Hosps. of Cleveland*, 202 F.3d at 848 n.7.[9] Further, the argument is fatally flawed for a several reasons.

First, the lone statement has been redacted; Dr. Kunath actually stated: "*Once she gets to her desk* she is able to do her work *but if she has to do any more walking during the day it is very difficult.*" (AR at 273). Second, Western & Southern ignores the broader picture painted by Dr. Kunath's notes and his *ultimate* conclusions on August 2; namely, that: (1) Watson suffers from Grade IV osteoarthritis in both knees

_____

[9] Although it is true that in reviewing Watson's appeal, the Committee noted that Dr. Kunath had stated Watson is "able to do her work but if she has to do any more walking during the day it is difficult," (AR at 235), there is no analysis as to why this statement was credited over Dr. Kunath's more recent conclusions on August 25, 2017; specifically, that Watson was "unable to perform any of [her] job functions," including walking to meetings, and would be "incapacitated" for at least six months. (AR at 267–68).

**"with limited capacity now to walk"** and; (2) **"The patient does look miserable . . . I think we're going to just have to put her on Disability."** (AR at 272–73).

Third, as noted above, Western & Southern's argument is belied by the plain language of the Plan. The fact that "[o]nce she gets to her desk she is able to do her work . . ." does not answer the question of whether Watson can, in fact, perform all of "the normal duties of [her] regular occupation" as a Senior Case Analyst, including walking to meetings during the day. (AR at 84, 278–79); *see Kalish*, 419 F.3d at 506–07 ("[T]he fact that a claimant is able to engage in sedentary work is an appropriate consideration in some cases" but in light of plan language "the fact that [the claimant] might be capable of sedentary work cannot be a rational basis for finding that he was not disabled" where there is some degree of walking and standing involved); *Hunter*, 437 F. App'x at 376–77 (same).

More importantly, Western & Southern's post-hoc explanation for the denial of benefits is simply not "consistent with the 'quantity and quality of the medical evidence' that is available on the record." *Moon*, 405 F.3d at 381 (quoting *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)). The isolated statement Western & Southern points to has been selectively lifted from Dr. Kunath's notes of August 2, 2017, and ignores Dr. Kunath's more recent conclusions on August 25, 2017. On August 25, Dr. Kunath plainly stated several conclusions that directly address the issue in a benefits determination under the Plan, *supra* Part B.2., including that Watson was "unable to perform ***any of [her] job functions***" and

would be "incapacitated" for at least six months. (AR at 267–68). Western & Southern reached a directly contrary conclusion, without any explanation, and "issue[d] a conclusory denial." *Corey*, 858 F.3d at 1028 (citing *Univ. Hosps. of Cleveland*, 202 F.3d at 848 n.7).

In short, Western & Southern "focused on [a] sliver[] of information that *could* be read to support a denial of coverage and ignored—without explanation—a wealth of evidence that directly contradicted its basis for denying coverage. Such a decision-making process is not deliberate or principled, and the explanation provided was far from reasoned, as it failed to address any of the contrary evidence." *Conger*, 474 F.3d at 265 (collecting cases); *Zuke*, 644 F. App'x at 654 (holding that the plan administrator's decision was arbitrary and capricious because it "stated that no objective evidence existed" and "defendants ignored key objective evidence and engaged in a selective review of the record"); *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 297 (6th Cir. 2005) (holding that record contained "conclusions which [the reviewing physician] never addresses head-on and simply seemed to ignore"). It follows then that Western & Southern's decision-making was arbitrary and capricious.

### 4.    Failing to Conduct a Physical Examination

Although "there is nothing inherently improper with relying on a file review . . . the failure to conduct a physical examination, where the Plan document gave the plan administrator the right to do so, raise[s] questions about the thoroughness and

accuracy of the benefits determination." *Shaw*, 795 F.3d at 551 (citations and internal quotation marks omitted; second alteration in original).

In this case, the Plan reserved the right to conduct a physical exam. (AR at 151, § 10.4(d)). The Sixth Circuit, however, has only "found fault with file-only reviews in situations where the file reviewer concludes that the claimant is not credible without having actually examined him or her" or where "the plan administrator, without any reasoning, credits the file reviewer's opinion over that of a treating physician." *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 663 (6th Cir. 2013) (citations omitted).[10] This case falls in the latter category, as concluded above, because Western & Southern did not offer any reason for rejecting the conclusions of Dr. Kunath, the physician who had conducted physical examinations of Watson. Thus, Western & Southern's failure to conduct a physical examination to rebut Dr. Kunath's findings is yet another reason to conclude that the benefits determination was arbitrary and capricious. *See, e.g.*, *Calvert*, 409 F.3d at 295; *Kalish*, 419 F.3d at 510; *Elliot*, 473 F.3d at 621.

### 5. Conducting a File Review Without a Consulting Medical Professional

---

[10] *Compare Shaw*, 795 F.3d at 550 ("The Plan made a credibility determination when it discounted [a treating physician]'s medical records because they were 'based solely on [the claimant]'s own subjective complaints of pain.'"), *with Bell v. Ameritech Sickness & Accident Disability Benefit Plan*, 399 F. App'x 991, 1000 (6th Cir. 2010) ("[N]either the Plan nor the [reviewing] doctors rendered credibility determinations or second-guessed the medical opinions of [the claimant]'s physicians.").

Even if Western & Southern was not faulted for conducting a file-only review, the fact that Western & Southern did not involve a medical professional in the file review is inherently arbitrary and capricious.

Federal regulations set forth "*minimum* requirements for employee benefit plan procedures" pertaining to claims for benefits. 29 C.F.R. § 2560.503-1(a) (emphasis added). One such requirement is that "[i]n deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment . . . [the plan administrator] shall consult with a health care professional who has appropriate training and experience . . . " *Id.* § 2560.503-1(h)(3)(iii). If a plan fails to do so in the administration of disability benefits, the plan "will not, . . . be deemed to provide a claimant with a reasonable opportunity for a full and fair review." *Id.* § 2560.503-1(h)(4) (incorporating the requirements of § 2560.503-1(h)(3)(i)–(v)); *Loan v. Prudential Ins. Co. of Am.*, 370 F. App'x 592, 597–98 (6th Cir. 2010). Here, there is nothing in the administrative record that indicates a consulting physician or nurse reviewed Watson's medical records on appeal and offered an opinion.[11]

The universe of evidence in the record regarding the "review" of Watson's STD benefits appeal is a document that resembles a worksheet and is little more than a page in length. (AR at 235–35). Handwritten at the end the document it states: "Denied – Medical records failed to document sickness or injury that would result in

---

[11] There is nothing arbitrary or capricious about having a nurse, rather than a physician, conduct the file review. *Judge*, 710 F.3d at 663.

employee's inability to perform the normal duties of her regular occupation." (AR at 236). There is no evidence that a medical professional was involved in the file review.

But now that Watson has filed suit, Western & Southern asserts in a passing reference that it considered "all the evidence . . . in consultation with the Consulting Physicians on the Benefits Appeals Committee." (Doc. 24 at 12). However, there is nothing in the administrative record to indicate that any physicians are part of the Committee, not to mention the fact that the record is silent as to any analysis or opinions offered by these unidentified physicians. As such, the Court cannot accept Western & Southern's bald assertion because a federal court's "review is confined to the administrative record." *Moon*, 405 F.3d at 378; *Corey*, 858 F.3d at 1027.

The mere fact that Western & Southern considered the so-called "ReedGroupMD Guidelines" and determined that Watson was not disabled is of no import. (Doc. 24 at 11); (AR at 250–60).[12] ERISA regulations explicitly require a "health care professional" to evaluate the unique circumstances of a claimant's condition on appeal.[13] An administrator is not excused from that requirement simply

---

[12] The ReedGroupMD Guidelines ("MD Guidelines") in the record contain a table that lists various conditions along with a range of time for which an individual with each condition may be considered disabled, depending on the level of physical activity involved (ranging from "sedentary" to "very heavy"). In addition, the MD Guidelines provide some general information about the condition (*e.g.*, cause, diagnosis, treatment, prognosis, costs, comorbidities, and ability to work). (AR at 250–260).

[13] It is telling that in the MD Guidelines for osteoarthritis, under the heading "Factors Influencing Duration," it states that "the presence of comorbid illness . . . may increase duration," (AR at 256), and the "comorbidities" listed include "obesity." *Id.*

because it relied on general guidelines. Moreover, Western & Southern has not directed the Court to any case where an administrator, in considering a claimant's appeal, was permitted to substitute guidelines for the judgment of a medical professional.

Rather, a consulting medical professional has, at a minimum, conducted a file review. *See, e.g.*, *Shaw*, 795 F.3d at 543 (administrator "forwarded [the claimant]'s file to two independent physician advisors to perform a medical review"); *Elliott*, 473 F.3d at 619 (a "physician consultant . . . conducted a file-only review"); *Clavert*, 409 F.3d at 291 ("In response to [claimant's] appeal, [the administrator] engaged . . . a neurosurgeon, to review [the claimant]'s medical records."); *Godmar*, 631 F. App'x at 400 (administrator "sent [the claimant]'s records to two board-certified physicians to conduct outside reviews").

In sum, Western & Southern issued a conclusory denial and in the process: failed to assess Watson's relevant job duties; failed to offer any reason(s) for rejecting the opinion of her treating physician; selectively reviewed her medical records, ignored favorable (and conclusive) evidence from a treating physician (Dr. Kunath); failed to conduct a physical exam; and performed its own file review without the benefit of a consulting physician. "While none of the factors alone is dispositive,"

---

at 257. Further, in the "ability to work" section, it states that the "risk," "capacity," and "tolerance" are "determined" by the "cause, location, and severity of the OA [osteoarthritis]." (AR at 258). Thus, even the MD Guidelines recognize that the practice of medicine cannot be reduced to a mechanical approach.

*Helfman v. GE Grp. Life Assurance Co.,* 573 F.3d 383, 396 (6th Cir. 2009), taken together they compel the conclusion that Western & Southern's decision was not "the result of a deliberate, principled reasoning process" nor is it "supported by substantial evidence." *Balmert*, 601 F.3d at 501 (citation and internal quotation marks omitted). Therefore, Western & Southern's decision was arbitrary and capricious.

### C.    Remedy

If a benefits plan has acted arbitrarily and capriciously, as in this case, there are "two options: award benefits to the claimant or remand to the plan administrator." *Shaw*, 795 F.3d at 551. In this case, a benefits award is the appropriate remedy.

The Sixth Circuit has consistently "awarded the claimant benefits where objective medical evidence clearly established the claimant's disability, even in circumstances where the plan administrator's decision-making process was unquestionably flawed." *Calhoun*, 665 F. App'x. at 497 (citation and internal quotation marks omitted) (awarding benefits based on objective medical evidence that claimant could not work "a sedentary occupation"); *Shaw*, 795 F.3d at 551 (collecting cases); *Hayden*, 763 F.3d at 609 (noting that the "errors were procedural in nature," but there was "no need to remand this matter for additional consideration"); *Kalish*, 419 F.3d at 513 (granting immediate award of benefits in light of objective medical evidence of disability); *Cooper*, 486 F.3d at 171–73 (same). By contrast, "where the problem is with the integrity of the plan's decision-making

process, rather than that a claimant was denied benefits to which he was clearly entitled, the appropriate remedy generally is remand to the plan administrator." *Shaw*, 795 F.3d at 551 (quoting *Elliott*, 473 F.3d at 622).

Here, Watson's disability is clearly supported by objective medical evidence, and therefore remand would "be a useless formality." *Shaw*, 795 F.3d at 551. Watson's x-rays, as reviewed by both Dr. Kunath and Dr. Hummel, confirm that Watson has severe, Grade IV osteoarthritis in both knees, and the condition is complicated by her obesity. (AR at 272, 249). Dr. Kunath concluded that Watson was "unable to perform any of [her] job functions," and specifically noted that this included simple tasks such as walking "around in the office" or to "meetings" and "sit[ting] for extended periods of time." (AR at 268). Dr. Kunath prescribed that Watson be "off work" for a "**minimum [of] 6 months**" (August 7, 2017, to February 7, 2018). *Id.* Dr. Hummel's report did not contradict these findings and recommendations. Nor did Western & Southern offer any credible evidence against Dr. Kunath's finding. *McDonald*, 347 F.3d at 172 (explaining that the arbitrary-and-capricious standard "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues."). Given that the objective medical evidence is so clearly one-sided, Watson is entitled to her STD benefits.

In a case such as this, Sixth Circuit precedent is clear: "Plan administrators should not be given two bites at the proverbial apple where the claimant is clearly entitled to disability benefits. They need to properly and fairly evaluate the claim the

first time around; otherwise they take the risk of not getting a second chance, except in cases where the adequacy of claimant's proof is reasonably debatable." *Cooper*, 486 F.3d at 172. There is nothing debatable about Watson's proof.

Accordingly, Watson is entitled to an award of STD benefits, plus prejudgment interest accrued from November 15, 2017, the date on which Western & Southern issued its final decision and denied Watson benefits. *See Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 585 (6th Cir. 2002).

## III. CONCLUSION

Consistent with this Memorandum Opinion, it is hereby **ORDERED** that:

(1) Defendant's motion for judgment on the administrative record (Doc. 24), is **DENIED**;

(2) Plaintiff's motion for judgment on the administrative record (Doc. 23), is **GRANTED**;

(3) Watson is entitled to an award of short-term disability benefits in an amount equal to two-thirds of her weekly rate of earnings for a period of 26 weeks (6 months), plus interest accrued from November 15, 2017; and

(4) The parties shall file a joint status report no later than **10 days** from entry of this order, setting forth a calculation of the amount to be awarded in exact figures.

This 16th day of August 2019.



**Signed By:**

**_William O. Bertelsman_** *WOB*

**United States District Judge**